### Cohn v. United States Corset Company.

1. To defeat a party suing for an infringement of letters-patent, it is sufficient to plead and prove that prior to his supposed invention or discovery the thing patented to him had been patented, or adequately described in some printed publication. A sufficiently certain and clear description of the thing patented is required, not of the steps necessarily antecedent to its production.
2. Letters-patent No. 137,893, issued April 15, 1873, to Moritz Cohn, for an improvement in corsets, are invalid, the invention claimed by him having been clearly anticipated and described in the English provisional specification of John Henry Johnson, deposited in the Patent Office Jan. 20, 1854, and officially published in England in that year.

Appeal from the Circuit Court of the United States for the Southern District of New York.

This was a suit for an infringement of the complainant's letters-patent, which are as follows:—

United States of America.

"*To all to whom these presents shall come:*

"Whereas, Moritz Cohn, of New York, N. Y., has presented to the Commissioner of Patents a petition praying for the grant of letters-patent for an alleged new and useful improvement in corsets, a description of which invention is contained in the specification, of which a copy is hereunto annexed and made a part hereof, and has complied with the various requirements of law in such cases made and provided; and,

"Whereas, upon due examination made, said claimant is adjudged to be justly entitled to a patent under the law:

"Now, therefore, these letters-patent are to grant unto the said Moritz Cohn, his heirs or assigns, for the term of seventeen years from the fifteenth day of April, 1873, the exclusive right to make, use, and vend the said invention throughout the United States and the Territories thereof.

"In testimony whereof, I have hereunto set my hand and caused the seal of the Patent Office to be affixed, at the city of Washington, this fifteenth day of April, in the year of our Lord one thousand eight hundred and seventy-three, and of the Independence of the United States of America the ninety-seventh.

  "Countersigned,     "B. R. Cowen,
             "*Acting Secretary of the Interior.*
[L. s.]          "M. D. Leggett,
             "*Commissioner of Patents.*"

United States Patent Office.

*Improvement in Corsets.*

"Specification forming part of letters-patent No. 137,893, dated April 15, 1873; application filed Jan. 30, 1873.

"*To all whom it may concern:*

"Be it known that I, Moritz Cohn, of New York City, in the State of New York, have invented certain new and useful improvements in corsets; and I do hereby declare that the following is a full and exact description thereof, reference being had to the accompanying drawing making part of this application:—

"Previous to my invention, it has been customary, in the manufacture of corsets, to weave the material with pocket-like openings or passages running through from edge to edge, or all stopped and finished off at a uniform distance from the edge, and adapted to receive the bones, which are inserted to stay the woven fabric, and

which serve as braces to give shape to and support the figure of the wearer. This method of manufacturing the corsets necessarily involves a great deal of hand labor, and, consequently, expense, in stitching up the ends where they are woven with pockets running through from edge to edge to hold the bones in place, or else the upper ends of the bones are necessarily all located at a uniform distance from the edge, resulting in a less perfectly shaped corset than is produced by following out my invention.

" I propose, by my invention, to overcome the objections just named, and produce a corset in which the location or position of the bones endwise shall be predetermined with the accuracy of the Jacquard in the process of weaving the corset stuff or material, while I at the same time effect a great saving of labor and expense, and give a more perfect shape. My invention has for its main object, therefore, not only the production of a better article, but also a reduction in the cost of manufacture; and, to these ends, my invention consists in having the pocket-like openings or passages into which the bones are put closed up near one end, at that point at which it is designed to have the end of each bone located, as will be hereinafter more fully set forth.

" To enable those skilled in the art to make and perfectly understand my invention, I will proceed to more fully describe it, referring by letters to the accompanying drawing, in which, for the purpose of illustration, I have represented two corsets, one made according to the mode of manufacture heretofore most generally practised, the other according to my new method.

" It will be seen, by reference to Figures 1 and 2, that the bones, $a$, are held or secured in place endwise in the pockets, $b$, of the corset material, C, by stitching, $e$, which is done after the insertion of the bone, and retains the bone endwise by closing up the passage-way or pocket in which it is located. This is in accordance with or illustrates the mode of manufacture originally practised, and only departed from prior to my invention, as heretofore explained.

" At Figures 3, 4, and 5 is illustrated, in elevation and longitudinal and cross sections, a corset made according to my improved plan.

" In these figures, A is the woven fabric of the corset, which, in lieu of being made with pocket-like openings or passages running through from edge to edge, or up to a uniform distance from the edge, I propose to have woven with pockets or passages, which extend from one edge of the fabric toward the other, but stop short

of the latter at such point or locality as is predetermined for the location of the end of each bone, according to the design or shape to be given to the corset, as shown.   The fabric is woven with the pockets extending, as seen, from one edge, B, of the fabric to the points, *b, c, d,* &c., and from these points out to the edge, F, the fabric is woven solid or without any passages.   *f f* represent the bones, which are made of the proper length, and are inserted from the edge, B, or at the open ends of the pockets.   After their insertion, the bones are pushed "home" to the bottom of their respective pockets, when the mouths or open ends of the said pockets are closed up by the stitching and binding of the edge, B, of the corset, and the perfect retention of the bones thus effected.

"It will be understood, that, by forming the corset, as described, with pockets closed at one end, and weaving in such pockets of varying lengths, I am enabled to determine, in the manufacture of the corset-fabric, the precise points to which the subsequently inserted bones shall extend, and thus pattern any number of corsets exactly alike, and to the most desirable model.

"Corsets made according to my improved plan, it will be seen, can be made to a perfect and regular pattern, will be more desirable in appearance, and can be produced at less cost than those made according to the mode of manufacture practised previous to my invention.

"I am aware of, and do not claim, a woven corset with the pockets stopped and finished off at a uniform distance from the edge; I am also aware of, and do not claim, a hand-made corset with pockets of varying lengths stitched on; but what I do claim as new, and desire to secure by letters-patent, is—

"A corset having the pockets for the reception of the bones formed in the weaving, and varying in length relatively to each other, as desired, substantially in the manner and for the purpose set forth."

The defendants, among other defences, set up that the letters-patent granted to the complainant were anticipated by the English provisional specification left by John Henry Johnson, at the office of the Commissioner of Patents, with his petition, on 20th January, 1854, viz.:—

"I., J. H. Johnson, of 47 Lincoln's Inn Fields, in county of Middlesex, and of Glasgow, North Britain, gentleman, do hereby declare the nature of said invention for improvements in the manufac-

~e of stays or corsets, communicated to me by Adolphe George
'eresine, of Paris, in empire of France, manufacturer, to be as
follows : —

"This invention relates to the manufacture of what are known
as woven corsets, and consists in the employment of the jacquards
in the loom, one of which effects the shape or contour of the corset,
and the other the formation of the double portions of slots for the
introduction of the whalebones. .

"These slots or double portions are made simultaneously with
the single parts of the corset; and, in place of being terminated in
a point, they are finished square off, and at any required length in
the corset, instead of always running the entire length, as is usually
the case in woven corsets. .

"When the corset is taken from the loom, the whalebones are
inserted into these cases, and the borders are formed, thus complet-
ing the article, which contains all the elegance and graceful contour
of sewn corsets made by manual labor. .

The court below, upon a final hearing, dismissed the bill;
whereupon the complainant appealed to this court.

Argued by *Mr. Benjamin F. Thurston* for the appellant, and
*Mr. George Gifford* for the appellee.

MR. JUSTICE STRONG delivered the opinion of the court.

A careful examination of the evidence in this case has con-
vinced us that the invention claimed and patented to the plain-
tiff was anticipated and described in the English provisional
specification of John Henry Johnson, left in the office of the
Commissioner of Patents on the 20th of January, A.D. 1854.
That specification was printed and published in England offi-
cially in 1854, and it is contained in volume 2d of a printed
publication circulated in this country as early as the year 1856.
It is, therefore, fatal to the validity of the plaintiff's patent if,
in fact, it does describe sufficiently the manufacture described
and claimed in his specification.    It must be admitted that,
unless the earlier printed and published description does ex-
hibit the later patented invention in such a full and intelligible
manner as to enable persons skilled in the art to which the in-
vention is related to comprehend it without assistance from
the patent, or to make it, or repeat the process claimed, it is
insufficient to invalidate the patent. Keeping this principle in

view, we proceed to compare the plaintiff's invention with the
antecedent Johnson specification.   In order to do this, a clear
understanding of the patent and of the invention the plaintiff
claims to have made is indispensable.   His application at the
Patent Office was made on the 30th of January, 1873.   In it
he claimed to have invented " a new and useful improvement
in corsets."   After reciting that previous to his invention it
had been customary in the manufacture of corsets to weave the
material with pocket-like openings or passages running from
edge to edge, and adapted to receive the bones which are in-
serted to stay the woven fabric, and which serve as braces to
give shape to and support the figure of the wearer, but that it
had been necessary, after the insertion of the bones into said
pocket-like passages, to secure each one endwise by sewing, he
proceeded to mention objections to that mode of making a
corset.   He specified two only.   The first was, that it involved
much hand labor and consequent expense in sewing in the
bones, or securing them endwise in the woven passages; and
the second was, that the arrangement or placement of the bones
in the passages had to be determined by hand manipulation,
and that it was, therefore, variable and irregular, such as fre-
quently to give to the corset an undesirable shape or appear-
ance near its upper edge.   These objections he proposed to
remove, and to produce a corset in which the location or posi-
tion endwise of the bones shall be predetermined with the accu-
racy of the jacquard, in the process of weaving the corset-stuffs,
or material; thereby effecting the saving of labor and expense
in the manufacture.   He, therefore, declared his invention to
consist in having the pocket-like openings or passages into
which the bones are put closed up near one end, and at that
point at which it is designed to have the end of each bone
located.   The claim then made was as follows : " A corset
woven with the pockets for the bones closed at one end,
substantially as and for the purpose set forth."   It is very
evident, that, when this application was presented to the Com-
missioner of Patents, the only invention the applicant supposed
he had made, and the only one claimed, was a corset the bone
pockets in which had been closed at one end in the weaving.
A patent for it was refused, for the reason assigned, that such a

corset was described in the printed publication of Johnson's specification. The plaintiff then amended his application, manifestly to set forth an invention differing in some particulars from that of Johnson. The amendment, however, proved insufficient, and a second rejection followed. Other amendments were then made, until his present patent was at last granted, dated April 15, 1873. In the specification which accompanies it the patentee admits, what he admitted at first, that prior to his invention it had been customary in the manufacture of corsets to weave the material with pocket-like openings or passages running through from edge to edge; and he makes the further admission, that it had been customary to weave the material with such passages all stopped and finished off at uniform distances from the edge. He, therefore, disclaims " a woven corset with the pockets stopped and finished off at a uniform distance from the edges," and disclaims also " a handmade corset with pockets of varying lengths stitched on; " and his claim is, " a corset having the pockets for the reception of the bones formed in the weaving, and varying in length relatively to each other as desired, substantially in the manner and for the purposes set forth." The specification nowhere sets forth the manner in which the alleged improvements in the corsets are produced, unless it be by reference to a jacquard in the loom. No process is described. None is patented. The claim is for a manufacture, not for a mode of producing it. Its peculiarities, as described, are that the pockets for the reception of the bones are formed in the weaving, rather than by hand, and that they are of varying lengths relatively to each other; that is, that the pockets differ in length from other pockets in the same corset, as desired. There are no other particulars mentioned descriptive of the patented improvement, unless they are that the weaving or variations in the length of the pockets are to be in the manner and for the purpose set forth in the specification. Referring to that, the purpose avowed is the production of a better-shaped corset at less expense; and the manner of effecting this is by substituting weaving for stitching, in closing the pockets at desired or predetermined distances from the edge. Now, in view of the patentee's disclaimers, stopping off the passages or pockets in

the weaving is not covered by the patent.   It is admitted that
had been done before, and no claim is made for it.   All that is
left, then, is, that the woven and closed pockets in the corset
vary in length.   No rule is stated for the variation.   It is not
stated which are comparatively short and which long, or how
much shorter some are than others, or how near any or all of
them come to the edge.   The demands of the claim in this
respect are met, if some of the pockets desired to be longer than
others are thus made.   But the claim must be further limited
in view of the state of the art when the application for the
patent was made.   The manufacture of hand-made and woven
corsets is an art long known, — known long before the Johnson
improvement.   Those made by hand had gores inserted to give
enlarged space for the breasts of the wearer, and also gores or
gussets at the lower part to give space for the hips.   In woven
corsets these enlargements, equivalent to gussets, were formed
by the jacquard loom.   For more than twenty years it has
been customary to weave in these gussets bone-pockets stopped
off or closed in the weaving at various distances from the edge
of the corset.   Those extending upward from the lower edges
were stopped off at varying heights, and those extending from
the upper edge downward over the breast were woven close at
their lower extremities at unequal distances from the top.   It
is true, that, where the stoppage was effected in weaving, the
pockets in the gussets were closed pointedly, and unavoidably
so, by the necessary contraction of the threads of the weft.   But
whether the stoppage was pointed, or blunt, or square, is unim-
portant.   It is not claimed as a feature of the plaintiff's inven-
tion.   His claim, then, cannot refer to the gusset pockets.   The
well-known state of the art, existing before even the Johnson
description, requires its limitation.   It must refer exclusively
to the pockets under the arms of the wearer, or on the back, or
in front of the body.   It claims weaving them of various
lengths when closed.   That is all.

Having thus analyzed the plaintiff's alleged invention, and
ascertained what it is, we are prepared to examine the Johnson
provisional specification, and inquire whether it described with
sufficient certainty and clearness a corset having the improve-
ment claimed by the plaintiff.   We quote at length the entire ·

description. Johnson, having declared the nature of the invention for which he sought a patent to be "improvements in the manufacture of stays or corsets," communicated to him by Adolphe Georges Geresme, of Paris, in the empire of France, described it as follows: "This invention relates to the manufacture of what are known as woven corsets, and consists in the employment of the jacquards in the loom, one of which effects the shape or contour of the corset, and the other the formation of the double portions of slots for the introduction of the whalebones. These slots or double portions are made simultaneously with the single part of the corset, and, in place of being terminated in a point, they are finished square off, and at any required length in the corset, instead of always running the entire length, as is usually the case in woven corsets. When the corset is taken from the loom, the whalebones are inserted into these cases, and the borders are formed, thus completing the article, which contains all the elegance and graceful contour of sewn corsets made by manual labor."

Undeniably this is a description of woven corsets, woven by the use of the jacquards in the loom, woven with slots or passages for the bones, made simultaneously with the other parts of the corsets, and requiring nothing to be done to them after their removal from the loom, except the insertion of the bones and the formation of the borders. It is also plainly a description of corsets in which the passages for the bones, called the double portions or slots, are finished; that is, stopped off in the weaving. That the expression "finished off square" means closed or stopped off square, is manifest, for several reasons. It is used to distinguish the manufacture from one in which the termination of the slots is pointed, as is always the case with the slots in the gussets, and necessarily so. The pointed terminations are closures, and the finished square terminations are only a different mode of closure. The idea in Johnson's mind was, therefore, that of ending, or termination by shutting up, or closing squarely, instead of enclosing pointedly. And it was the slot or passage that was to be finished off, and not merely the upper portion of the slot, or one of its sides. A second reason for concluding that the specification describes closed slots or passages is found in the concluding paragraph, which states,

that, when the corsets are taken from the loom, all that remains to be done to complete them is to insert the bones into these " cases," and form the borders.  Thus, it is, said, they are completed, " containing all the elegance and graceful contour of sewn corsets made by manual labor."   There is not an intimation that the needle is to be applied after removal from the loom.   This portion of the description is utterly inconsistent with the idea that the pockets are not closed by the weaving.  If they are not, more is required to complete the corsets after the loom has done its work than forming the borders and inserting the bones.   The pockets must be closed by stitching before they are ready for the bones.   Besides, those parts of the corset which in one part of the specification are denominated " double portions of slots," and in another, " slots, or double portions " finished square off, are also called " cases," a word that expresses the idea of enclosure, and which is inapplicable to open passages.   For these reasons, we cannot doubt that the meaning of the specification is, that the passages, slots, double portions, cases, pockets, by whatever name they are called, are to be closed in the weaving.   And the plaintiff so understood it when he applied for his patent.   In view of the published description to which his attention was called, he disclaimed stopping and finishing off the pockets in the weaving, and stated in his amended specification that he was aware of corsets thus made, and that it had been customary in the manufacture to weave the material with pocket-like passages, all stopped and finished off at uniform distances from the edge, and adapted to receive the bones.

It is manifest, then, that there is nothing in the plaintiff's patent which was not described in the Johnson specification, unless it be that the closed slots or cases mentioned in the former are required to be woven of varying length.   A variation in the length of the pockets relatively to each other, as desired, is, as we have seen, the sole distinctive feature of the plaintiff's invention.   But it was well known before Johnson filed his specification that the bone-pockets of a corset must vary in length.   They were made to vary in hand-made corsets, and in woven ones by sewing.   In all corsets, whether hand-made or woven, the pockets under the arms were made shorter, and

those at the back and in front were made longer, in order to fit the wearer and preserve a graceful shape at the top. Every person skilled in corset making knew the necessity of such variation. In Johnson's description, it was asserted that the shape or contour of his corset was formed in the weaving; so far, therefore, as that was effected by the relative length of the pockets, it was dependent upon the loom. The description left to the manufacturer to determine what should be the length of each pocket, in order to secure the elegance and graceful contour of sewn corsets; in other words, to determine before the weaving where the double portions or slots should be stopped off. Johnson knew — having before him the state of the art at the time — that pockets of uniform length would not adapt the corset to fit the wearer, and would not be consistent with elegance of shape. And there is not a word in his description that intimates the pockets are to be stopped off or closed at uniform distances from the edge or without variation in length. The contrary idea is manifest. It is said, they are to be finished (closed) *at any required length.* Required length? Required by whom, and for what? Plainly by the manufacturer; and that they may have all the elegance and graceful contour of sewn corsets made by manual labor, and also that they may fit the wearer. Such a requirement could be met only by pockets of different lengths in the same corset. And if they were stopped wherever required, and it was required that they should stop off at varying distances from the edges of the corset, the description pointed out a corset thus made. It is true, no particular length of the different pockets was specified, nor was any proportion mentioned which one pocket should bear in length to another. That was left to the manufacturer, as it is to the manufacturer of hand-made corsets, and as it is in the plaintiff's specification. He does not say how near to the upper edges of his corset the base of the closed pockets comes, nor what proportion in length one bears to the others. He simply describes them as varying in length relatively to each other, as desired. This is certainly not more definite than Johnson's description. In both, the variations in length and their relative proportions are left to the judgment and taste of the corset-maker. It is impossible, therefore, to

find any thing in the plaintiff's patent which was not with equal definiteness and perspicuity described in the printed publication (Johnson's specification), made nineteen years before the patent was granted.

It is quite immaterial, even if it be a fact, that the Johnson specification is insufficient to teach a manufacturer how to make the patented corset.   It is enough if it sufficiently describes the corset itself.   Neither it nor the plaintiff's specification exhibits the process of making.  . Neither of them set up a claim for a process.   The plaintiff claims a manufacture, not a mode of making it; and the important inquiry, therefore, is, whether the prior publication described the article.   To defeat a party suing for an infringement, it is sufficient to plead and prove that the thing patented to him had been patented or described in some printed publication prior to his supposed invention or discovery thereof.   Rev. Stat., sect. 4920.   What is required is a description of the thing patented, not of the steps necessarily antecedent to its production.   But the evidence shows that the Johnson specification, in connection with the known state of the art at the time when it was filed and published, was sufficient to enable one skilled in the art of corset-making and in the use of the jacquard to make the patented corset.   It is very clearly proved that it gave sufficient instruction, and that it needed no addition to furnish full information to a corset-weaver how to weave a corset with the use of the jacquard, and stop off all the bone-pockets in the weaving at the right places.   It is also proved that the corset patented to the plaintiff can be made as easily by the use of two jacquards, as described by Johnson, as by the use of one; and it was so made during the trial of the present case.   It is, however, unnecessary to consider the possibilities of two jacquards in operation at the same time in one loom.   It could only be material if the plaintiff was claiming a process for making a corset. It is enough for this case that the invention patented to the plaintiff was clearly described in 1854, in the printed publication of the Johnson (Geresme) provisional specification.   The patent is, therefore, invalid, and hence the decree of the Circuit Court dismissing the bill must be affirmed.

`· *Decree affirmed.*`

MR. JUSTICE CLIFFORD dissenting.

Inventors are required, before they receive a patent, to deliver a written description of their inventions, and of the process of making, constructing, and using the same, "in such full, clear, concise, and exact terms," as to enable persons skilled in the art or science to make, construct, and use the same.

Power to grant letters-patent is vested in the commissioner; but when the power is exercised and the patent has been duly granted, it is of itself *prima facie* evidence that the patentee is the original and first inventor of that which is therein described and secured to him as his invention.

Proofs are admissible to overcome that presumption; but it is well-settled law that patented inventions cannot be superseded by the mere introduction of a foreign publication of the kind, though of a prior date, unless the description and drawings contain and exhibit a substantial representation of the patented improvement, "in such full, clear, concise, and exact terms," as to enable any person skilled in the art or science to which it appertains, to make, construct, and use the invention to the same practical extent as he would be enabled to do if the information was derived from a prior patent. Applicants for a patent are as much required to describe the manner and process of making, constructing, and using the invention, as they are to file in the Patent Office a written description of the alleged improvement; and both are expressly required to be in such full, clear, concise, and exact terms, as to enable any person skilled in the art or science to make, construct, and use the invention.

Nothing deserving the least consideration is exhibited in the record to support the defence that the appellant is not the original and first inventor of the patented improvement, except the Johnson specification, which, in my judgment, does not contain or exhibit a substantial representation of the patented invention in such full, clear, concise, and exact terms, as to enable even an expert, without previous experiments, to make, construct, or practise the invention.

Instead of that, the provisional specification fails altogether to describe the means or mode of operation by which the

pockets of varying lengths are to be stopped or closed in the process of weaving. Conclusive support to that proposition is found in the fact that it became necessary for the infringers to experiment for a long time before they could imitate the patented product.